UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

CHRISTINA K. PLUMB,                    )
                                        )
                    Plaintiff,          )
                                        )
            v.                          )        No.  2:11CV67 TIA
                                        )
MICHAEL ASTRUE, Commissioner            )
of Social Security,                     )
                                        )
                    Defendant.          )

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves an application for Disability Insurance Benefits under Title II of the Act.

Claimant has filed a Brief in Support of her Complaint; the Commissioner has filed a Brief in

Support of his Answer. The parties consented to the jurisdiction of the undersigned pursuant to

28 U.S.C. § 636(c).

## I.      Procedural History

On October 16, 2008, Claimant Christina Plumb filed an application for Disability

Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq.  (Tr.

146-59).[1]  In the Disability Report Adult completed by Claimant and filed in conjunction with the

applications, Claimant stated that her disability began on September 18, 2008, due to depression,

seizures, fibromyalgia, degenerative disc disease, herniated discs in neck, and back pain. (Tr. 163-

_____

[1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 13/filed November 23, 2011).

71).  On initial consideration, the Social Security Administration denied Claimant's claims for benefits.  (Tr.66-71).  Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 74-75).  On October 16, 2009, a hearing was held before an ALJ.  (Tr. 19-59).  Claimant testified and was represented by counsel.  (Id.).  Vocational Expert Frank Mendrick also testified at the hearing.  (Tr. 53-59, 107).  Thereafter, on November 4, 2009, the ALJ issued a decision denying Claimant's claims for benefits.  (Tr. 6-18).  On August 26, 2011, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision after considering the contentions raised in claimant's request for review in counsel's letter.  (Tr. 1-5, 109-21).  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on October 16, 2009

#### 1.  Claimant's Testimony

At the hearing on October 16, 2009, Claimant testified in response to questions posed by the ALJ and counsel.  (Tr. 19-53).  At the time of the hearing, Claimant was thirty-seven years of age.  (Tr. 24).  Claimant lives in a house with her husband and three daughters ages 17, 16, and 3.  (Tr. 24).  Claimant stands at five feet four inches and weighs approximately 220 pounds.  (Tr. 24-25).  Claimant has a drivers license with restrictions due to her seizures.  (Tr. 25).  Claimant is right-handed and completed the eighth grade.  (Tr. 25).  Claimant receives long-term disability from her last employer.  (Tr. 26).

Claimant last worked on September 18, 2008 as a Corrections Officer 2.  (Tr. 26).  Claimant testified that she was terminated, because she had to be six-months seizure free before

returning to work. (Tr. 26). Claimant worked as a laborer in a factory and a waitress. (Tr. 27). Since leaving her job as a corrections officer, Claimant has not looked for other work. (Tr. 27).

Claimant testified she experiences seizures and has been diagnosed with fibromyalgia, arthritis in her knees, degenerative disc disease in her lower back, a herniated disc in her neck, and diabetes. (Tr. 28). Claimant has a seizure once a month and takes Carbatrol as treatment. (Tr. 49). During a seizure, Claimant convulses and wets her pants. (Tr. 49). Claimant testified that she has petit mal seizures three times a month. (Tr. 50). Dr. Mark Tucker started treating Claimant a year earlier, and she sees him once a month. (Tr. 29). Dr. Tucker refills her prescriptions and treats her back by adjusting her back. (Tr. 30). Claimant has been treated every three months by Dr. Tiedi, a pain management doctor, for two years. Dr. Tiedi prescribes medications and gives injections in her back. (Tr. 30). Claimant had been treated on two occasions by Dr. Hooshmand, a neurologist, for about seven months. Dr. Hooshmand discussed her seizure disorder, and he would not sign her release to return to work. (Tr. 31). Claimant testified that Dr. Hooshmand told her not to drive. (Tr. 31). Claimant testified that she did not know whether he filed a notice of the restriction with the Missouri Department of Motor Vehicles. (Tr. 50). Claimant testified that she takes Carbatrol, Alprazolam, Nortriptyline, Metformin, Hydrocodone, Zoloft, Tramadol, and Sertraline. (Tr. 32, 47). Claimant testified that her medication regimen helps her for the most part, and she does not experience any side effects from the medications. (Tr. 32). Claimant testified that she does not have any psychological conditions affecting her ability to work. (Tr. 36). Claimant testified that Dr. Tucker prescribes Sertraline as treatment of her depression, and she does not like to go anywhere outside the house other than taking a walk. (Tr. 36). Claimant testified that the medication helps her. (Tr. 37).

- 3 -

Claimant experiences a tingly pain in her lower back and down her left leg to her knee. (Tr. 38). Claimant testified she experiences pain every day for the almost half of the day. (Tr. 39). Claimant also has pain in her shoulders and neck causing difficulty turning her head. (Tr. 39). Claimant's neck pain radiates down her left arm to her fingers twice a day causing problems using her fingers. (Tr. 44-45). Claimant testified that stress triggers the pain. (Tr. 45). Claimant has sharp pain in both knees, and her right knee gives out four to five times a day. (Tr. 39). Physical activity causes her pain to increase. (Tr. 40). Sometimes Claimant applies ice pack to alleviate her pain in her back. (Tr. 40). Claimant experiences a migraine headache once a month, and she rests in a dark room and applies ice to her neck. (Tr. 43). Claimant testified that the headache lasts for four to five hours and takes Naproxen. (Tr. 43). Although she has not discussed with her doctors, Claimant testified that thirty minutes after eating, she has diarrhea, and spends five minutes in the bathroom. (Tr. 46). Claimant testified that she spends approximately ninety minutes a day lying down. (Tr. 52).

With respect to her daily activities, Claimant testified that she gets up and makes coffee and fixes her daughter breakfast. (Tr. 32). Claimant starts household chores by dusting and cleaning parts of the bathrooms and doing laundry. (Tr. 33). Claimant puts her daughter down for a nap around noon. (Tr. 33). Claimant lies down and rests while her daughter naps for an hour and a half each day. (Tr. 34). After fixing her daughter lunch, Claimant finishes doing the laundry and cleans out closets. Claimant's daughters empty the dishwasher and load the dirty laundry into the washing machine. (Tr. 51). Claimant fixes the evening meal and then sits down and watches television. (Tr. 34-35). Claimant testified that she dress without assistance. (Tr. 35). Claimant's daughters brush her hair, because raising her arms above her head causes pain.

(Tr. 45). Claimant does the grocery shopping, the dishes, sometimes gardens and helps her father. (Tr. 35-36). For exercise, Claimant stretches her back. (Tr. 36). Claimant testified that she visits family once a month. (Tr. 37). Even though she takes Tylenol PM and Advil PM, Claimant testified that she has problems sleeping, and she is awake most of the night. (Tr. 47).

Claimant testified that she has difficulty sitting and carrying and lifting. (Tr. 28-29). Claimant has problems concentrating and when reading a book, she drifts off and has to reread pages. (Tr. 38).

Claimant testified that she can lift fifteen pounds, walk two hours out of an eight-hour day, stand for fifteen minutes in an eight-hour day, and sit for three hours in an eight-hour work day. (Tr. 39-41).

### 2. Testimony of Vocational Expert

Vocational Expert Frank Mendrick, a vocational rehabilitation counselor, testified in response to the ALJ's questions. (Tr. 53-59). Mr. Mendrick identified the State of Missouri as the specific region of the country that he would reference concerning the existence and number of jobs. (Tr. 54). Mr. Mendrick identified corrections officer and laborer as the past relevant work summary for Claimant. (Tr. 55).

The ALJ asked Mr. Mendrick to assume

a hypothetical individual in the age range of 36 to 37, educated at an eight grade level, past relevant work the same as claimant, limited to light work, only frequently climb ramps, stairs, balance, and kneel, occasionally stoop, crouch and crawl, never climb ladders, ropes or scaffolds, limited reaching in all directions including overhead, and must avoid constant threat of exposure to vibrations and all exposures to hazards. How would these restrictions affect past relevant work?

(Tr. 55-56). Mr. Mendrick opined that the hypothetical individual could no do any of the past

work and have no transferrable skills into light work. (Tr. 56). With respect to an unskilled entry level job, Mr. Mendrick testified that there are unskilled jobs such an individual could perform such as factory work including a general assembly position, a Small Products Assembler, DOT code is 706.684-022 and an inspector of electronic produces, DOT code is 723.687-014 with approximately 55,000 jobs available in the region. (Tr. 56-57). Mr. Mendrick testified there would be 7,000 to 8,000 sedentary jobs available to accommodate the restrictions in the hypothetical. (Tr. 57). Mr. Mendrick testified that these jobs are consistent with the descriptions in the Dictionary of Occupational Titles and Standard Characteristics of Occupations. (Tr. 57).

The ALJ asked Mr. Mendrick to assume if he finds Claimant totally credible and all of her impairments supported by the medical record, would there be any jobs she could perform? (Tr. 57). Mr. Mendrick indicated that Claimant could not perform any jobs due to the number of unscheduled breaks and the need to lie down. (Tr. 57).

Claimant's counsel asked counsel to take into consideration a reduction in numbers in light of the economic development since May 2008. (Tr. 58). Mr. Mendrick testified that the standard rate is ten percent reduction. (Tr. 58).

The ALJ then clarified his hypothetical to no overhead reaching instead of limited reaching in all directions including overhead reaching. (Tr. 58). Mr. Mendrick explained that since all of the jobs discussed were jobs where the worker works in front of himself, this clarification would not change his testimony, and his answer remained the same. (Tr. 58-59).

### 3. Open Record

A review of the record shows that counsel submitted the additional medical records as requested by counsel to the ALJ before he issued a decision denying Claimant's claims for

benefits.  (Tr. 42, 127-31).

### 4.  Forms Completed by Claimant

Claimant's daughters reported their mother being sad and unable to stand for long before sitting down and unable to walk for long.  (Tr. 218, 222).  The daughters reported their mother experiences pain in her back and knees.  (Tr. 218, 222).  The daughters reported that their mother uses a wheelchair when going to big stores.  (Tr. 219, 223).  The daughters reported that Claimant cannot do any household chores without taking a break and causing her pain.  (Tr. 219, 224).

In the Function Report - Adult dated December 4, 2008, Claimant reported taking care of her two-year old daughter and playing with her, cooking, cleaning, and doing the laundry.  (Tr. 185).  Claimant tries to walk if the weather permits.  (Tr. 171).  Claimant reported feeding the pets and sometimes bathing the pets.  Claimant indicated that she can clean her house all at once, but she has to sit and rest a few times.  (Tr. 185).  Claimant indicated that she can prepare sandwiches , easy casseroles, soups, and salads.  (Tr. 186).  With respect to household chores, Claimant can pick up, dust, clean bathroom, wipe down kitchen with bleach, and do the laundry and she does these chores every day for two hours.  (Tr. 186).  Claimant indicated that she is not allowed to drive due to her seizures for six months.  (Tr. 187).  Claimant goes shopping once a month for two hours to purchase food and cleaning supplies.  (Tr. 187).

In the Function Report - Appeal, Claimant reported having more pain and experiencing more depression since March 15, 2009.  (Tr. 210).

## III.    Medical Records

The April 28, 2007 MRI of Claimant's lumbar spine showed a small cyst of doubtful clinical significance; evidence of spasm and disc protrusions at the C4-5 and C5-6 levels and disc bulging at C6-7 level; and mild cental canal stenosis at the C5-6 level. (Tr. 354-55).

On September 4, 2007, Claimant sought treatment for back pain at the Eastern Missouri Health Services. (Tr. 270). The doctor prescribed medications and although Claimant requested Oxycodone, the doctor would not prescribe the medication. (Tr. 270).

In a follow-up visit at Eastern Missouri Health Services on September 25, 2007, Claimant reported continued back pain, and the doctor prescribed medications including Oxycodone. (Tr. 269). On October 23, 2007, Claimant returned for follow-up treatment for low back and shoulder pain. (Tr. 268).

During a visit to Eastern Missouri Health Services, Claimant reported swelling in the right side of her face. (Tr. 267). The November 13, 2007 x-ray of Claimant's head/neck showed a mixed echo right neck mass in the region of the right parotid gland. (Tr. 266). The radiologist opined the mass to be suspicious for an abscess. (Tr. 266).

In a follow-up visit on December 3, 2007 at Eastern Missouri Health Services for medications, Claimant reported continued back pain and having a nineteen-month baby. (Tr. 265). The provider refilled prescriptions. (Tr. 265).

On February 28, 2008, Claimant reported back pain at the Vandalia Clinic. (Tr. 413, 432). In a follow-up visit on March 19, 2008, Claimant reported chronic back and neck pain. (Tr. 412, 431).

On May 20, 2008, Dr. Tiedi noted in a treatment note has no activity restrictions imposed. (Tr. 337-41). Claimant's chief complaint was neck and back pain. (Tr. 342). Claimant was

referred for consideration of comprehensive pain management. Claimant reported a decade history of pain in cervical and lumbar spine. Claimant also reported depressive symptoms and insomnia. After reviewing MRIs, Dr. Tiedi noted in the lumbar spine no significant pathology, and in the cervical spine, some right moderate paracentral disc protrusion at L4-5 and 5-6 level. Dr. Tiedi noted that prior treatment included various medications with no significant benefit. (Tr. 342). Claimant reported smoking a package of cigarettes each day. (Tr. 343). Claimant reported being married for three years and having four children and completing twelve years of education. (Tr. 344). Under Current Level of Occupation, the following notation is made: "She is currently employed and she is not disabled." (Tr. 344). Dr. Tiedi observed no overt pathologic pain behavior, and noted her mood to be euthymic. Dr. Tiedi found her multiple tender points to be consistent with fibromyalgia. (Tr. 344). Dr. Tiedi diagnosed Claimant with diffuse myofascial pain consistent with fibromyalgia ,evidence of cervical spondylosis without overt evidence of radiculopathy, and anxiety disorder. (Tr. 344-45). Dr. Tiedi determined to withhold interventions at that juncture given the diffuse nature of her pain and opined if Claimant localizes her pain, he may pursue some facet injections most likely at the lumbar spine. (Tr. 345).

On June 17, 2008, Claimant received treatment for diffuse pain across lumbar spine at the pain management center at Audrain Medical Center. (Tr. 319-29). Dr. Tiedi noted that previous imaging of lumbar spine showed some nondescript degenerative changes in the cervical spine without significant neurocompressive lesions in the lumbar spine. (Tr. 329). Dr. Tiedi observed Claimant to be dysthymic but appropriate. Dr. Tiedi diagnosed Claimant with lumbar spondylosis, cervical spondylosis, and fibromyalgia. Dr. Tiedi administered L4-5 and L5-S1 lumbar facet joint injections with sedation. (Tr. 329, 370).

On July 28, 2008, Dr. John O'Connor treated Claimant for bilateral lower leg swelling. (Tr. 502). Dr. O'Connor noted Claimant has a history of back problems. Claimant reported after receiving an injection by Dr. Tiedi, her back hast been about 75% to 90% better. Claimant acknowledged she had to cancel a follow-up appointment with Dr. Tiedi due to a death in the family. (Tr. 502).

Claimant returned to the Vandalia Clinic on August 14, 2008 and reported lower back pain and shoulder pain. (Tr. 411, 429-30). Claimant indicated that she received a steroid injection in June, and this helped alleviate her pain for one month. Examination showed mild tenderness to her spine and lumbar muscles. The doctor observed Claimant to have a good mood/affect and prescribed Darvocet for her pain. (Tr. 411, 429-30). In follow-up treatment on August 18, 2008, Claimant was diagnosed with fibromyalgia, and the doctor directed Claimant to seek follow-up treatment with pain management doctor. (Tr. 410).

On September 18, 2008, Claimant sought treatment in the emergency room at Audrain Medical Center after experiencing a seizure. (Tr. 292-93). Claimant reported having a grand mal seizure one year earlier, but she did not go to a doctor or seek medical treatment. (Tr. 294-95). Claimant reported not having a primary care physician. (Tr. 295). Claimant smokes a package of cigarettes each day. (Tr. 295). After treatment, Claimant was discharged to home. (Tr. 296). The CT scan showed a normal scan of her head and no skull fracture or intracranial bleeding. (Tr. 300).

On September 22, 2008, Claimant returned to the Vandalia Clinic and reported having a seizure while at work. (Tr. 409, 428).

The September 25, 2008, MRI of Claimant's brain showed a septal spur, mild paranasal

sinus disease, and no intracranial abnormality. (Tr. 283).

On October 2, 2008, Claimant reported having insomnia. (Tr. 407, 427). The doctor observed Claimant's mood to be good/affect and prescribed Xanax and directed Claimant not to consume alcohol and caffeine. (Tr. 407, 427).

On October 9, 2008, Dr. Ahmad Hooshmand evaluated Claimant for assessment and management of her seizure disorder. (Tr. 383). Claimant reported having seizure in August 2007 and losing consciousness and urinary incontinence. Claimant reported not seeking medical attention until September 18, 2008 when she experienced another seizure. Claimant reported being a working mother. (Tr. 383). Claimant reported a history of low back pain. Claimant reported being "happy with her life and her marriage is good and she loves her work." (Tr. 384). Dr. Hooshmand noted psychiatric review of system does not show history of depression. Evaluation showed Claimant's mental status to be grossly normal. Evaluation showed Claimant's shrug of shoulder to be normal and symmetrical. Dr. Hooshmand noted Claimant's MRI of her brain showed septal spur, and no evidence of intracranial abnormality. (Tr. 384). Dr. Hooshmand found Claimant to have generalized tonic clonic seizure on two different occasions and history of low back pain "on tramadol that can be contributing factor to her seizure." (Tr. 385). Dr. Hooshmand explained to Claimant that she needs to take her medication regularly and faithfully. Dr. Hooshmand also advised Claimant not to drive a car for six months. (Tr. 385). Dr. Hooshmand opined in a prescription note as follows: "This is to certify that above mentioned person has been in office for evaluation of her seizure. She may continue to work but she should avoid any type of activity that loss of consciousness is harmful to patient...." (Tr. 405).[2] Dr.

_____

[2]The undersigned notes that he could not decipher the last four to five words on the note.

- 11 -

Hooshmand prescribed medication as treatment.  (Tr. 405).

On October 14, 2008, Claimant reported experiencing back pain even though she is taking Vicodin.  (Tr. 403, 426).  Examination showed mild tenderness in the thoracic area.  Dr. Goeffrey Thomas observed Claimant's to have good mood/affect.  Dr. Thomas offered physical therapy program as treatment.  (Tr. 403, 426).  Dr. Thomas prescribed physical therapy as treatment for Claimant's lumbar spine and advised Claimant to quit smoking.  (Tr. 404, 426).  In telephone call on October 20, 2008, Claimant reported having a seizure but not seeking medical attention inasmuch as there is nothing to be done.  (Tr. 402).  Dr. Thomas ordered Claimant to contact a neurologist.  (Tr. 402).  In a follow-up visit on October 31, 2008, Claimant reported having seizure, wheezing, fever, nasal congestion, and a productive cough.  (Tr. 399, 425).  Claimant reported no new seizures since new dosage of medication.  (Tr. 399, 425).  Dr. Thomas prescribed medications as treatment.  (Tr. 399, 425).

On November 4, 2008, Claimant sought treatment in the emergency room at Audrain Medical Center reporting ongoing right sided lumbago.  (Tr. 310-11).  Dr. Tiedi noted Claimant has diffuse pain complaints consistent with fibromyalgia and right sided lumbosacral pain.  Dr. Tiedi noted on the last visit on June 17, 2008, he performed facet injections bilaterally at the L4-5, L5-S1 level.  (Tr. 311).  Claimant reported three weeks of profound improvement, but she now has had recrudescence of pain.  Claimant reported a change in her health, some seizure activity.  Dr. Tiedi observed Claimant to be euthymic and appropriate, and Claimant not to have over pathologic pain behavior.  Examination showed tenderness across right lumbosacral junction.  Dr. Tiedi found Claimant to have mechanical low back pain with questionable facet arthopathy and fibromyalgia.  Dr. Tiedi opined he wanted to confirm diagnosis of facetogenic pain prior to

proceeding with any radiofrequency lesioning. (Tr. 311). Dr. Tiedi ordered diagnostic medial branch blocks and continued her medication regimen. (Tr. 311, 313). Claimant reported significant improvement in her pain upon discharge after the administration of the lumbar facet block injection. (Tr. 313,316).

On November 5, 2008, Claimant reported not much benefit from injections the day before and no immediate pain relief. (Tr. 391).

Claimant cancelled her appointment on November 20, 2008 at the Vandalia Clinic. (Tr. 398, 424, 493). On November 21, 2008, Claimant returned for follow-up treatment for petit mal seizure activity and sinus congestion. (Tr. 397, 423, 492). Dr. Thomas observed Claimant's mood/affect to be good and prescribed medications as treatment. (Tr. 397, 423, 492).

In a follow-up visit on December 12, 2008, Claimant reported depression and weight loss due to trouble with life issues and failed disability determination. (Tr. 422, 491). Dr. Thomas observed Claimant to have a good mood/affect. Dr. Thomas diagnosed Claimant with anxiety disorder and found no episodes of seizure disorder. Dr. Thomas prescribed Celexa and advised possibility of seizure as a side effect. (Tr. 422, 491).

On December 22, 2008, Claimant called and reported mild fever and zero seizure activity. (Tr. 420). Claimant cancelled her appointment on December 24, 2008. (Tr. 419, 489). On December 29, 2008, Claimant reported left knee pain and left groin pain starting two days earlier. (Tr. 418). Claimant reported not having another seizure. Dr. Thomas observed Claimant to have a good mood/affect. Dr. Thomas prescribed medications as treatment. (Tr. 418).

Claimant returned for seizure medication refill and reported left knee pain. (Tr. 488). Claimant reported being seizure free. Dr. Thomas diagnosed Claimant with knee bursitis and

prescribed medications. (Tr. 488).

On January 13, 2009, Claimant reported having a seizure one week earlier. (Tr. 487). Dr. Thomas directed Claimant to follow-up with Dr. Hooshmand. (Tr. 487). On January 16, 2009, Claimant cancelled her appointment at the Vandalia Clinic. (Tr. 478).

Claimant cancelled her appointment at the Vandalia Clinic on February 2, 2009. (Tr. 485). On February 20, 2009, Claimant returned for follow-up treatment for seizure on January 1, 2009 and knee pain. (Tr. 484).

In the Physical Residual Functional Capacity Assessment completed on March 5, 2009, Jennifer Black, a medical consultant, listed Claimant's primary diagnosis to be degenerative change LS & CS and chronic back pain, and his secondary diagnosis to be generalized seizure disorder and fibromyalgia.. (Tr. 433). The consultant indicated that Claimant can occasionally lift twenty pounds, frequently lift twenty ten pounds, and stand and walk about six hours in an eight-hour workday. (Tr. 434). The consultant noted that Claimant can sit about six hours in an eight-hour workday and has unlimited capacity to push and/or pull other than shown. As evidence in support, the consultant noted how examination suggests fibromyalgia. (Tr. 434). The consultant indicated that Claimant has no established visual or communicative limitations. (Tr. 436-37). With respect to postural limitations, the consultant found Claimant could never climb ladder/rope/scaffolding, occasionally stoop, crouch, or crawl, and frequently climb stairs or kneel in order to prevent symptom exacerbation. (Tr. 436). With respect to manipulative limitations, the consultant found Claimant to be limited in reaching all directions as well as no overhead reaching. The consultant found Claimant should avoid exposure to heat and hazards and avoid concentrated exposure to vibration to prevent symptom exacerbation. (Tr. 437). In support, the

consultant noted how Claimant lives with and takes care of three children. (Tr. 438). Although Claimant reported back and neck pain, she testified that she is able to lift twenty pounds and is able to perform light household chores, prepare meals, and shop once a month for two hours. The consultant opined based on the evidence in the file, Claimant's allegations are credible. (Tr. 438).

In the Psychiatric Review Technique dated March 9, 2009, Michael Stacy, PhD, found Claimant's medical impairments, affective disorders and anxiety-related disorders, to be not severe. (Tr. 439-49). In the functional limitations, Dr. Stacy found Claimant to be mildly limited in maintaining social functioning. (Tr. 447). Dr. Stacy noted that Claimant's depression and anxiety disorder are treated with medication by her primary care physician. (Tr. 449). In the treatment notes, the doctor noted Claimant to have good mood and affect. Further, the consultation with the neurologist for seizure disorder showed Claimant to be alert and oriented times three with mental status grossly normal. Dr. Stacy found based on the total evidence in the file, Claimant's allegations are credible, but her mental impairments not to be severely limiting. (Tr. 449).

Claimant cancelled her appointment at the Vandalia Clinic on March 26, 2009. (Tr. 483). On March 31, 2009, Claimant returned for follow-up treatment for a seizure. (Tr. 481). Dr. Thomas noted Claimant failed to complete physical therapy for knee pain. Dr. Thomas observed Claimant to have good mood/affect. (Tr. 481).

On April 6, 2009, Claimant sought treatment at Hannibal Regional Hospital for severe frontal and bilateral temporal headache. (Tr. 453-55). Examination showed normal range of motion in all four extremities and no tenderness to palpation. Psychiatric examination showed

Claimant to be oriented to person, place, and time and to have a normal mood and affect. (Tr. 456). Claimant was diagnosed with a common migraine and treated with medications. (Tr. 457, 464).

The discharge orders of Dr. Debra Koivunen noted Claimant's activities of daily living not to be restricted with respect to walking, lifting, and stair climbing. (Tr. 467). Her diagnosis was hidradenitis right acilla, and Dr. Koivunen performed an excision of hidradenitis in right axilla. (Tr. 468).

Claimant was a no show for her follow-up visit to Vandalia Clinic on April 28, 2009. (Tr. 476).

In the June 9, 2009 progress note, Dr. Tucker noted how Claimant takes Carbatrol 300 mg, but she missed several doses prior to her seizure the day before. (Tr. 498). Dr. Tucker opined that the missed doses and her failure to eat may have induced her seizure activity. Dr. Tucker also advised Claimant to lose weight. Examination showed her lower back tender bilaterally on the lumbar musculature, and no tenderness of the spinous process. (Tr. 498). Dr. Tucker advised Claimant not to drive for three months and to restart use of Carbatrol on a regular basis to prevent additional seizures. (Tr. 499). Dr. Tucker refilled her Hydrocodone and instructed Claimant to begin a regular exercise program. (Tr. 499).

On July 6, 2009, Claimant reported low back pain, and the pain medications basically work. (Tr. 500). Claimant requested Dr. Tucker to fill out her disability paperwork. Dr. Tucker noted that her disability continues inasmuch as Claimant continues to have intermittent seizures despite her treatment with medications. Dr. Tucker noted Claimant did not have a seizure in the last month. Dr. Tucker completed the paperwork stating that Claimant had a permanent disability

beginning on September 18, 2008 and continuing indefinitely. (Tr. 500). In a follow-up appointment on August 5, 2009, Dr. Tucker made no notation regarding Claimant's seizures and treatment of her seizures. (Tr. 501).

On September 1, 2009, Claimant returned for treatment of the back pain. (Tr. 128, 509). Claimant reported her medications not alleviating her low back and shoulder pain. Examination showed reduced range of motion of her cervical and right lumbar spine and tenderness over lumbar spine musculature. Dr. Tucker treated Claimant with osteopathic manipulative treatment. Claimant noted good results after treatment, and Dr. Tucker advised Claimant to restrict her activity for one to three days before resuming normal activity. Dr. Tucker refilled her Hydrocodone medicine for pain. Dr. Tucker made no notation regarding Claimant's seizures and treatment of her seizures. Dr. Tucker provided a osteopathic manipulative treatment, and Claimant reported good results after the manipulation. Dr. Tucker restricted Claimant's activity for one to three days and then indicated Claimant could resume normal activity. (Tr. 128, 509).

Claimant returned on September 30, 2009, and complained of a tremendous amount of stress stemming from pregnancy of teenage daughter and causing migraine headaches. (Tr. 129, 510). Claimant reported the treatment for her neck during the last visit really helped her pain and requested the treatment again. Dr. Tucker increased the dosage of Nortirpyline and started Naprosyn to help prevent headaches. After giving osteopathic manipulative treatment, Claimant reported good results. Dr. Tucker made no notation regarding Claimant's seizures and treatment of her seizures. (Tr. 129, 510).

On October 12, 2009, Claimant returned to Dr. Tucker's office so that he could complete her disability papers. (Tr. 130, 511). Claimant reported her disability primarily related to

- 17 -

seizures, left median nerve radiculopathy, and bilateral lumbar radiculopathies. Although Dr. Tucker listed seizures in the assessment/plan section of the progress note, he provided no treatment for her seizures. (Tr. 130,511). In the Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Tucker noted Claimant can lift ten pounds occasionally, less than ten pounds frequently, stand at least two hours in an eight-hour workday, and sit less than six-hours in an eight-hour workday and periodically alternate sitting and standing. (Tr. 504-05). With respect to pulling, Dr. Tucker noted Claimant to be limited in her upper and lower extremities. (Tr. 505). With respect to postural limitations, Dr. Tucker found Claimant can frequently climb, balance, kneel, crouch, crawl, and stoop. (Tr. 505). Dr. Tucker found Claimant to be limited in reaching all directions including overhead and has no other manipulative limitations. (Tr. 506). Dr. Tucker found Claimant has no visual/communicative limitations. (Tr. 506). With respect to environmental limitations, Dr. Tucker found Claimant should avoid temperature extremes, vibration, humidity/wetness, hazards, and fumes, odors, and chemical gases. (Tr. 507). Dr. Tucker noted Claimant has been disabled since September 18, 2008, and the limitations will last for twelve consecutive months. (Tr. 507).

Claimant returned for a recheck of her depression on October 28, 2009. (Tr. 131, 512). Claimant reported Zoloft no longer helping and pain medications for her low back work well. Examination showed tenderness of lumbar spine musculature bilaterally. Dr. Tucker noted her mood showed depressed appearance, and she seemed somewhat anxious. Dr. Tucker discontinued Zoloft and prescribed Symbyax and refilled her Hydrocodone prescription. Dr. Tucker made no notation regarding Claimant's seizures and treatment of her seizures. (Tr. 131, 512).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through December 31, 2012.  (Tr. 11).  Claimant has not engaged in substantial gainful activity since September 18, 2008, the alleged onset date.  (Tr. 11).  The ALJ found that the medical evidence establishes that Claimant has the severe impairments of seizure disorder, degenerative disc disease, fibromyalgia, obesity, and chronic back pain, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 11-12).  The ALJ Claimant has the residual functional capacity to perform light work with the following exceptions: "the claimant must never climb ladders, ropes or scaffolds; only occasionally stoop, crouch, and crawl; and only frequently climb ramps and stairs, balance, and kneel.  The claimant must be restricted to no overhead reaching, avoid all exposure to heat and hazards, and avoid concentrated exposure to vibration."  (Tr. 12).  The ALJ found that Claimant is unable to perform her past relevant work.  (Tr. 16).  Claimant's date of birth is July 9, 1972 making her thirty-six years old which is defined as a younger individual on the alleged disability onset date.  The ALJ noted that Claimant has a limited education and is able to communicate in English.  (Tr. 16).  The ALJ noted that using the Medical-Vocational Rules he found that Claimant is not disabled regardless whether Claimant has transferable job skills.   (Tr. 16-17).  Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs in significant numbers in the national economy that the Claimant can perform.  (Tr. 17).  The ALJ found that Claimant was not under a disability from September 18, 2008 through the date of the decision.  (Tr. 17).

## V.    Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is

not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision. Id. The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at

730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to give her testimony substantial credibility. Claimant also contends that the ALJ erred by failing to give controlling weight to her treating physician, Dr. Tucker. Next, Claimant contends that the ALJ's RFC is not supported by substantial evidence. Claimant contends the ALJ erred in evaluating the severity of her fibromyalgia. and failed to consider the impact of her obesity on her ability to work. Claimant also argues that the ALJ had a duty to order an IQ test as requested by her counsel. Finally, Claimant contends the ALJ failed to accord proper weight to the opinions of Claimant's daughters.

A.    Claimant's Credibility Determination

Claimant contends that the ALJ failed to properly give her hearing testimony substantial credibility.

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Instead, the ALJ must fully consider all of the evidence relating to the subjective complaints, including the Claimant's work record, the absence of objective medical evidence to support the complaints, and third party observations including treating and examining doctors as to:

1.    claimant's daily activities;

2.  duration, frequency and intensity of the pain;

3.  precipitating and aggravating factors;

4.  dosage, effectiveness and side effects of medication;

5.  functional restrictions.

Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  The ALJ may disbelieve the claimant's subjective complaints "if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole.  Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989).  "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review."  Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995).   Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, his decision should be upheld.   Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).  However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically.  Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1966).  The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown, 87 F.3d at 966.  The ALJ's credibility

findings are entitled to deference if the findings are supported by multiple valid reasons.  See Goff v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005); Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination).  The undersigned finds that the ALJ's credibility determination is supported by substantial evidence.  In relevant part, the ALJ opined that "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Tr. 15).

In his decision the ALJ thoroughly discussed the lack of medical evidence corroborating Claimant's subjective complaints of functional limitations, her activities of daily living, and the neurologist's findings.  See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities).  The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints.  See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).  The ALJ noted that although Claimant asserts that she is unable to work due to fibromyalgia, chronic back pain and seizure disorder, the clinical and objective medical findings are inconsistent with an individual experiencing totally debilitating symptomatology.  In support,

the ALJ cited to the treatment notes from Dr. Hooshmand. The ALJ then addressed other inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician stated that Claimant was disabled or unable to work during the relevant time period. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional or physical limitations. Likewise, the medical evidence is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment although Claimant testified otherwise at the hearing. See Id.; Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).

Claimant's activities of daily living provide further support of the ALJ's credibility

determination. Claimant testified that she lives in a house with her husband and three children, and she takes care of the children, attends school activities, picks up the house, dusts, cleans parts of the bathroom, cleans out closets, does laundry, prepares meals, shops for groceries, and sometimes helps her father in the garden.[3]  While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Claimant's daily activities can nonetheless be seen as inconsistent with her subjective complaints of disabling impairments and my be considered in judging the credibility of complaints.  Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain); Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001) (concluding "daily activities [such] as getting up, eating, reading, cleaning the house, making the bed, and doing dishes with the help of [a spouse], making meals, visiting with friends, and occasionally shopping and running errands" are inconsistent with a claimant's subjective

_____

[3]Although Claimant testified that she lies down and rests while her daughter naps for an hour and a half each day, there is no objective medical evidence substantiating Claimant's need to lie down for ninety minutes each day.  See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). Indeed, the record shows that there is no objective medical evidence substantiating Claimant's need to lie down for ninety minutes.  Further, the record shows Claimant never reported to any doctors her need to lied down for ninety minutes each day.  Likewise, no doctor determined Claimant needed to lied down for ninety minutes as a medical necessity.  Thus, if Claimant was not resting for ninety minutes out of medical necessity, she must be doing so out of choice.  See Craig v. Chater, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); Cf.  Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day).

complaints of disabling pain). Indeed, the Eighth Circuit holds that allegations of disabling "pain

may be discredited by evidence of daily activities inconsistent with such allegations." Davis v.

Apfel, 239 F.3d 962, 967 (8th Cir. 2001). "Inconsistencies between [a claimant's] subjective

complaints and her activities diminish her credibility." Goff v. Barnhart, 421 F.3d 785, 792 (8th

Cir. 2005). See also Nguyen v. Chater, 75 F.3d 429, 439-41 (8th Cir. 1996) (holding that a

claimant's daily activities, including visiting neighbors, cooking, doing laundry, and attending

church were incompatible with disabling pain and affirming denial of benefits). The Court finds,

therefore, that the ALJ properly considered Claimant's daily activities upon choosing to discredit

her subjective complaints.

The ALJ also considered the consultant opinion finding Claimant can perform light work

with some restrictions including never climbing ladders, ropes, or scaffolds, occasionally stooping,

crouching, and crawling, limiting all overhead reaching, and avoiding all exposure to heat and

hazards and concentrated exposure to vibration.

The ALJ also considered Claimant's depression in the decision, and noted that although

Claimant alleged depression to be a severe impairment, she testified that no psychological

conditions affected her ability to work.

The ALJ considered the medical record and the diagnoses by all the treating physicians

and explained why he was crediting the diagnosis of some of the doctors and not crediting the

diagnosis of other doctors. Based on the objective medical evidence, the ALJ determined

Claimant's impairments not to be severe impairments, and the undersigned finds that substantial

evidence supports the ALJ's determination. The undersigned notes that where there are conflicts

in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to

make.  Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000); Beasley v. Califano, 608 F.2d 1162, 1166 (8th Cir. 1979).  This is so even when the medical evidence is in conflict.  Cantrell, 231 F.3d at 1107; Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)("Where the medical evidence is equally balanced, ... the ALJ resolves the conflict.").  "It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).

Finally, the ALJ considered that Dr. Hooshmand, a neurologist, opined in October 2008 that Claimant may continue to work, but she should "avoid any type of activity that loss of consciousness is harmful to her."  (Tr. 16).

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled.  Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible.  Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints.  See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court.  Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings.  See Leckenby v.

Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. See Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, the courts normally defer to his credibility determination). The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's lack of medical evidence corroborating Claimant's subjective complaints of functional limitations, her activities of daily living, and the consultative examiner's findings. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain). The

undersigned finds that substantial evidence supports the ALJ's finding the medical records do not support the extent of Claimant's subjective complaints of pain. See Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (standard of review; substantial evidence is enough that reasonable mind might accept it as adequate to support decision). In conclusion, the Court finds that the ALJ's consideration of Claimant's credibility is based on substantial evidence.

The substantial evidence on the record as a whole supports the ALJ's decision. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case).Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.    Weight Given to Treating Doctor

Claimant contends that the ALJ failed to properly give controlling weight to Dr. Tucker, her treating physician.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).

A treating physician's opinion may be, but is not automatically, entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. SSR 96-2P, 1996 WL 374188 (July 2, 1996). Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record. Id. "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009). When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010( (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

In a medical source statement dated October 12, 2009, Dr. Tucker opined that Claimant has been disabled since September 18, 2008.[4]  As discussed by the ALJ, Dr. Tucker opined that she could lift ten pounds occasionally, less than ten pounds frequently, stand or walk for at least two hours and sit for less than six hours in an eight-hour workday with the option to alternate periodically between sitting and standing.  Dr. Tucker further opined Claimant is limited in pushing and pulling in both upper and lower extremities and in reaching all directions including overhead.  Dr. Tucker indicated that Claimant should avoid exposure to temperature extremes, vibration, humidity/wetness, hazards, and pulmonary irritations.  The ALJ opined as follows: "[t]o the extent this opinion is more restrictive than the residual functional capacity statement, the undersigned is unable to accord this opinion more than little weight, because it is generally inconsistent with the reports and testimony of the claimant herself and is conclusory, providing little explanation of the evidence relied on in forming th fill-in-the-blanks opinion."  (Tr. 16).

The opinions and findings of a claimant's treating physician are entitled to "controlling weight" if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3da 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).

First, the undersigned notes that the medical source opinion cited by Claimant was completed over one year after Claimant's alleged disability onset date.  Indeed, as noted by the ALJ, Dr. Tucker's finding with respect to lifting is contradicted by Claimant's own testimony.

---

[4]A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," 20 C.F.R. § 416.927(e)(1), (3), because it invades the province of the Commissioner to make the ultimate determination of disability.  House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

Many of Dr. Tucker's limitations such as the environmental and postural limitations are accommodated in the ALJ's RFC.

A treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v, Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004).

While the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 62, 632 (8th Cir. 2007) (holding a treating physician's opinion does not automatically control or obviate need to evaluate the record as a whole and upholding ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by an explanation). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) ((holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). In the year-long course of treatment, Dr. Tucker never instructed Claimant to limit her activities or placed any functional restrictions on her. Cf. Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) (treating physician discredited because neither he nor any other doctor restricted claimant's activities). The ALJ acknowledged that Dr. Tucker was a treating source, but that his opinion of October 12, 2009 was not entitled to controlling weight, because it was inconsistent with his prescribed medical treatment . See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Likewise, Dr. Tucker's opinion is inconsistent with his own treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to

discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). Indeed, in his treatment notes Dr. Tucker never set forth any specific limitations on physical activity. Dr. Tucker's treatment notes do not reflect the degree of limitation he noted in his opinion. The undersigned concludes that the ALJ did not err in affording little weight to Dr. Tucker's opinion of October 12, 2009.

Finally, a treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, a brief conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting opinion where the treating physician's statements were conclusory in nature."). Further, the ALJ set forth good and specific reasons for not giving controlling weight to Dr. Tucker's opinion. See King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984)(holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as not being

supported by any detailed, clinical, or diagnostic evidence).

C.      Residual Functional Capacity

Claimant argues that there was insufficient evidence supporting the ALJ's RFC

determination.  RFC is a medical question and the ALJ's determination of RFC must be supported

by substantial evidence in the record.  Hutsell v. Massanari, 259 F.3d 707. 711 (8th Cir. 2001);

Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  RFC is what a claimant can do despite her

limitations, and it must be determined on the basis of all relevant evidence, including medical

records, physician's opinions, and a claimant's description of her limitations.  Dunahoo v. Apfel,

241 F.3d 1033, 1039 (8th Cir. 2001).  While the ALJ is not restricted to medical evidence alone in

evaluating RFC, the ALJ is required to consider at least some evidence from a medical

professional.  Lauer, 245 F.3d at 704.

The ALJ thoroughly reviewed Claimant's medical history, and explained why he could not

defer to Dr. Tucker's opinion.  The Court therefore concludes the ALJ's credibility assessment

and RFC determination are supported by substantial evidence on the record as a whole.

D.      The ALJ's Failure to Consider her Fibromyalgia and Obesity in the RFC

Claimant contends that although the ALJ found obesity and fibromyalgia to be severe

impairments, he failed to consider the impact of obesity and fibromyalgia on her ability to work.

Fibromyalgia, a chronic condition recognized by the American College of Rheumatology

("ACR"), is inflammation of the fibrous and connective tissue, causing long-term but variable

levels of muscle and joint pain, stiffness, tenderness, and fatigue.  See Jeffrey Larson,

Fibromyalgia, in 2 The Gale Encyclopedia of Medicine, 1326-27 (Jacqueline L. Longe et al. eds,

2d ed. 2002).  Fibromyalgia is diagnosed based on a history of at least three months of widespread

pain with tenderness in at least eleven of the eighteen tender-point sites known as trigger points.

Id. Treatments include massage, trigger-point injections, proper rest and diet, physical therapy,

patient education, and medication such as muscle relaxants, antidepressants, and anti-

inflammatory pain medications. Id.

Fibromyalgia has the potential to be disabling. Forehand v. Barnhart, 364 F.3d 984, 987

(8th Cir. 2004) (noting (1) fibromyalgia is a chronic condition, usually diagnosed after eliminating

other conditions; (2) no confirming diagnostic tests exist; (3) the Eighth Circuit has long

recognized fibromyalgia might be disabling). The Secretary has noted that fibromyalgia is

medically determinable and that the presence of certain symptoms, including the presence of focal

trigger points, may be sufficient to establish the diagnosis. See Social Security Ruling 99-2p;

Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003) ("objective medical evidence of

fibromyalgia [includes] consistent trigger-point findings.").

Obesity is a non-exertional impairment. Lucy v. Chater, 113 F.3d 905, 909 (8th Cir.

1997). The Social Security Ruling 02-01p "requires an ALJ to consider the effects of obesity

when assessing RFC, including the fact that the combined effects of obesity with other

impairments considered separately." DeWitt v. Astrue, No. 09-3250. 2010 WL 2181759, at *2

(10th Cir. June 2, 2010) (unpublished). The federal regulations require the same. When assessing

the claimant's RFC, the ALJ "must consider any additional and cumulative effects of obesity...."

Hanauer v. Astrue, Cause No. 2:09cv30JCH/MLM, 2010 WL 1687809, at *18 (E.D. Mo. Apr. 7,

2010) (quoting 20 C.F.R. , Pt. 404, Subpt. P, App. 1), Report and Recommendation Adopted by,

2010 WL 1691904 (E.D. Mo. Apr. 27, 2010).

The record shows that the ALJ did consider the nature of fibromyalgia and obesity in

determining Claimant's RFC. The ALJ included exertional, postural and environmental limitations to account for Claimant's credible limitations caused by obesity and fibromyalgia. The undersigned notes that at the hearing, Claimant failed to testify how either obesity or fibromyalgia resulted in additional work-related limitations. See McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010) ("Given that neither the medical records nor testimony demonstrates that her obesity results in additional work-related limitations, it was not reversible error for the ALJ's opinion to omit specific discussion of obesity."). These impairments resulted in exertional limitations of Claimant being able to occasionally lift twenty pounds, frequently lift twenty ten pounds, and stand and walk about six hours in an eight-hour workday. She has postural limitations of never climb ladder/rope/scaffolding, occasionally stoop, crouch, or crawl, and frequently climb stairs or kneel in order to prevent symptom exacerbation. She has environmental limitations of needing to avoid exposure to heat and hazards and avoid concentrated exposure to vibration to prevent symptom exacerbation. With respect to manipulative limitations, the consultant found Claimant to be limited in reaching all directions as well as no overhead reaching. Accordingly, by including the exertional, postural, and environmental limitations in the RFC, the ALJ accounted for Claimant's credible limitations due to the combination of her severe impairments including those limitations caused by obesity and fibromyalgia.

To the extent Claimant claims her activities are restricted beyond the limitations which the ALJ included in his RFC, a record , such as that in the matter under consideration, which does not reflect physician imposed restrictions suggests that a claimant's restrictions in daily activities are self-imposed rather than by medical necessity. See Zeiler v. Barnhart, 384. F.3d 932, 936 (8th Cir. 2004) ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie

down during the day."); Fredrickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily.")

E.     ALJ's Failure to Develop the Record

Claimant also argues that the ALJ had a duty to order an IQ test as requested by her counsel before the hearing. In support, Claimant notes that she only completed the eighth grade and exhibits signs of slow cognitive processing. For the first time, Claimant alleges that the ALJ erred by not sending her for a consultative mental examination.

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (alteration in the original).

In Halverson v. Astrue, 600 F.3d 992, 933 (8th Cir. 2010), the Eighth Circuit rejected a claimant's argument that the ALJ had erred by not ordering a consultative mental examination, finding that the ALJ had properly based his adverse decision on the medical records, the claimant's statements, and "other evidence." See also Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010) ("[T]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.") (internal quotations omitted). Indeed at the hearing, Claimant testified that she does not have any psychological conditions affecting her ability to work. Where there is substantial evidence in the record to support the ALJ's decision, the ALJ does not err in failing to

order a consultative examination.  Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001).  The

paucity of evidence of treatment for Claimant's depression does not detract from this

substantiality.  See e.g. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (finding that

claimant's failure to provide medical evidence supporting her allegations of work limitation

"should not be held against the ALJ when there is medical evidence that supports the ALJ's

decision.").

An ALJ's duty to develop the record arises only if a crucial issue was undeveloped.  The

record contains medical evidence from the relevant time period regarding Claimant's alleged

disabilities.  See Onstead v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993) (reversal due to failure

to develop the record is warranted only where the failure is unfair or prejudicial).  "'The ALJ is

required to order medical examinations and tests only if the medical records presented to him do

not give sufficient medical evidence to determine whether a claimant is disabled.'"  Halverson, 600

F.3d at 933 (quoting Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)).  Other than

Claimant completing only the eighth grade, there is no evidence of a mental impairment.  The

record is devoid of any evidence showing she left any jobs for any reason related to her

intellectual functioning.  Indeed, neither in her application or her hearing testimony, does Claimant

assert any borderline intellectual functioning.  In the instant case, there was sufficient medical

evidence for the ALJ to determine that Claimant had not manifested mental retardation before the

age of 22 and thus, the ALJ did not err by not having her IQ tested.  See e.g. Clay v. Barnhart,

417 F.3d 922, 928-29 (8th Cir. 2005) (rejecting argument that Commissioner erred by not finding

that claimant satisfied listing for mental retardation; claimant had not initially claimed mental

retardation and only evidence to support onset before age 22 was "poor performance in, and early

exit from school."). Hence, the ALJ did not fail in his duty to fully and fairly develop the record.

F.      Third Party Function Reports

The ALJ considered the opinions of Claimant's daughters. Third parties' observations are evidence to be considered, but can be discredited. See Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988) (third party testimony not credible when the third party has a financial interest in the case and lived with plaintiff). The ALJ noted how Claimant's daughters submitted third party function reports on her behalf and set forth the opinions contained therein.

Claimant contends that the ALJ failed to give specific reasons for discrediting their opinions. While the Eighth Circuit Court of Appeals has frequently criticized the failure of an ALJ to consider subjective testimony of the family and others and while such testimony must be considered, no case directs that reversal is appropriate where an ALJ fails to specifically state reasons  when he has discredited the testimony of the claimant. See e.g., Rautio, 862 F.2d at 180 ; Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984). Moreover, the ALJ may discount corroborating testimony on the same basis used to discredit Claimant's testimony. See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 2006). Where the same evidence that the ALJ relied upon when discrediting the testimony of Claimant would have been the same evidence which would have supported discrediting Claimant's daughters, the ALJ's failure to address or discount the testimony of Claimant's daughter is inconsequential. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that an ALJ's decision need not be reversed where he failed to consider testimony which would not have had an effect on the outcome of the case). Moreover, an ALJ may discount the testimony of a family member if the family member has a financial stake in the outcome of the claimant's case. See

Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006); Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir. 1993); see also Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996) (discounting claimant's family's testimony because it conflicted with the medical evidence). Given their close relationship to Claimant, the ALJ did not err by not giving weight to their opinions. The Court finds, therefore, that the ALJ properly considered the opinions of Claimant's daughters and that his decision, in this regard, is supported by substantial evidence.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**. Dated this   28th    day of September, 2012.

_____  /s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE